IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY E. PLAZA, | ) |
| Plaintiff, | ) ) ) |
| | ) C.A. 05-203 Erie |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) |
| Defendant. | ) ) |

## OPINION

This case is before us on appeal from a final decision by the defendant, Commissioner of Social Security ("the Commissioner"), denying Jeffrey E. Plaza's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act (the "Act") during the closed period adjudicated of July 7, 1995 through April 29, 1999. The parties have submitted cross-motions for summary judgment. For the reasons stated below, we deny the plaintiff's motion and grant the defendant's motion.

## I. General Background

Mr. Plaza protectively applied for disability insurance benefits and supplemental security income on September 22, 1995, alleging disability based on physical impairments of back pain, knee problems, and carpal tunnel syndrome, and mental impairments, since July 7, 1995. His application was initially denied, and then denied on reconsideration. Thereafter, a hearing was held on June 4, 1997, before Administrative Law Judge ("ALJ") William Pope (R. at 311-338), who issued a decision denying benefits on January 17, 1998 (Ex. 32, R. 161-173). Mr. Plaza requested a review by the Appeals Council. Before the Appeals Council ruled, however, Mr. Plaza filed subsequent applications for DIB and SSI on June 2, 1998, which were merged with the present case. On December 14, 1999, the Appeals Council

vacated the January 17, 1998 hearing decision and remanded the case to an ALJ for further consideration.

Thereafter, Mr. Plaza, represented by counsel, appeared and testified at an administrative hearing before ALJ Michael F. Colligan on March 29, 2000. (R. at 339-360.) A vocational expert, Fred Monaco, testified at the hearing. At the March 29, 2000 hearing, Mr. Plaza's claims were formally amended to indicate a request for a closed period of disability from July 7, 1995 to April 29, 1999, since he had returned to work as of that time. (R. at 19, 342.) On July 29, 2000, the ALJ issued his decision denying disability benefits and supplemental security income and finding that Mr. Plaza was not disabled. (R. at 19-29.)

The Appeals Council denied Mr. Plaza's request for review on May 7, 2004, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 10-13.) Mr. Plaza then filed this action seeking judicial review of the ALJ's decision.

Mr. Plaza was born on June 20, 1968, has a high school education, is married and has three children. He has past work experience as a dishwasher and a lifeguard.

## II. Standard of Review

The standard of review in social security cases is whether substantial evidence exists in the record to support the Commissioner's decision. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir.2000). "Substantial evidence has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Fargnoli v. Massanari, 247 F.3d 34,38 (3d Cir. 2001) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir.1995)). Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently. Fargnoli, 247 F.3d at 38; 42 U.S.C. § 405(g).

"Under the Social Security Act, a disability is established where the claimant demonstrates that there is some 'medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period.'"

Fargnoli, 247 F.3d at 38-39 (quoting Plummer, 186 F.3d at 427 (other citation omitted)); *see also* 20 C.F.R. § 404.1505(a). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42 U.S.C. § 423(d)(2)(A)).

The Commissioner has provided the ALJ with a five-step sequential evaluation process to be used when making this disability determination. See 20 C.F.R. § 404.1520. The United States Court of Appeals for the Third Circuit sets forth the five-step procedure as follows:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § [404.] 1520(a). . . .   In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). . . . In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful  work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994).  If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. *See* 20 C.F.R. § 404.1523.  The ALJ will often seek the assistance of a vocational expert at this fifth step. *See*, [sic] Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984).

Fargnoli, 247 F.3d at 39 (quoting Plummer, 186 F.3d at 428).

For mental impairments, an additional regulatory process supplements the five- step process outlined above:

> [This process] require[s] the hearing officer (and ALJ) to record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in the case record, in order to determine if a mental impairment exists. If an impairment is found, the examiner must analyze whether certain medical findings relevant to a claimant's ability to work are present or absent. The examiner must then rate the degree of functional loss resulting from the impairment in certain areas deemed essential for work. If the mental impairment is considered  "severe", the examiner must then determine if it meets a listed

mental disorder. If the impairment is severe, but does not reach the level of a listed disorder, then the examiner must conduct a residual functional capacity assessment. At all adjudicative levels, a Psychiatric Review Treatment Form ("PRT form") must be completed. This form outlines the steps of the mental health evaluation in determining the degree of functional loss suffered by the claimant.

Knight v. Barnhart, 195 F.Supp.2d 569, 578-79 (D.Del. 2002).

The claimant carries the initial burden of demonstrating by medical evidence that he is unable to return to his previous employment due to a medically determinable impairment. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Once the claimant meets this burden, steps one through four described supra, the burden of proof shifts to the Commissioner to show that the claimant can engage in alternative substantial gainful activity. Id.

### III. ALJ's Decision

In summary, the ALJ found that based on Mr. Plaza's non-exertional mental limitations and the claimant's age, education, and work experience, Mr. Plaza is not under a "disability." (R. at 28.) In particular, the ALJ found that Mr. Plaza retains the residual functional capacity to perform unskilled work-related activities provided that the work consists of no more than simple, routine, repetitive tasks, which involve minimal contact with the public and with co-workers. (R. at 28.)

The ALJ undertook the five-step sequential evaluation in determining that Mr. Plaza was not disabled. The ALJ made the following findings:

(1) that Mr. Plaza had not engaged in substantial gainful activity during the closed period from July 7, 1995 to April 29, 1999;

(2) that Mr. Plaza suffers from paranoid delusional disorder, an impairment which is severe;

(3) his mental impairment, although severe, does not meet or equal the criteria of the Listing of Impairments set forth in 20 C.F.R. Pt. 404, SubPart P, Appendix 1, Regulations No. 4;

(4) he retains the residual functional capacity for work with the following limitations: he cannot perform more than simple, routine, repetitive tasks, which involve minimal contact with the public and with co-workers; and

(5) based on his age, educational background, work experience, and residual functional capacity during the closed period from July 7, 1995 to April 29, 1999, Mr. Plaza was able to make a successful adjustment to work which exists in significant numbers in the national economy, such as a handpacker, a bench assembly person, and a janitorial worker.

The ALJ also found that Mr. Plaza's statements regarding his impairment and its impact on his ability to work during the closed period are not entirely credible. (R. at 28, 25-26.) The ALJ explained that Mr. Plaza's testimony of the severity of his limitations due to his mental impairment is not supported by the weight of the medical evidence and that his symptoms are not as limiting as he alleges. (R. at 25-26.) The ALJ also noted that several examining doctors, while recognizing Mr. Plaza's mental impairment, also suspected some malingering based on Mr. Plaza's inconsistent test results, his responses, and his allegations. (R. at 26.)

Dr. Aloysius Kush performed a consultative examination in November 1995 to address Mr. Plaza's complaints of back pain from a car accident and work injuries. Dr. Kush gave Mr. Plaza a diagnosis of a mild lumbar strain. With regard to Mr. Plaza's physical problems, the ALJ notes that there is no medical evidence in the record to show a diagnosis regarding Mr. Plaza's knee problems or carpal tunnel in both hands. The ALJ found no objective medical evidence to support any of Mr. Plaza's alleged physical limitations, and therefore the ALJ found that Mr. Plaza had no severe physical impairment and no exertional limitation. Mr. Plaza does not contest this finding, and thus we concern ourselves only with Mr. Plaza's mental impairments.

As noted, the ALJ found that the medical evidence supported a finding that Mr. Plaza suffered from the severe mental impairment of paranoid delusional disorder, but that it did not meet or equal the criteria of any of the listed impairments in Appendix 1 of the Regulations.

## IV. Legal Analysis

Mr. Plaza, who represents himself in this action, filed a one-page response to the Commissioner's Brief in support of summary judgment with an attached one-page letter exhibit from his psychiatrist dated August 4, 2000. (Doc. 12.) In his Response, Mr. Plaza states that although he was denied benefits for the time period under consideration in this action, he later became entitled to social security benefits. We note that Mr. Plaza later became entitled to benefits, as explained in the Notice of Appeals Council Action denying Mr. Plaza's request for review, when he was "found disabled beginning April 15, 2000 based on subsequent applications

[Mr. Plaza] filed on June 15, 2000; . . . ." (R. at 11.) The Appeals Council considered the fact that Mr. Plaza had been found disabled as of April 15, 2000, but "found that this information does not warrant a change in the Administrative Law Judge's decision." (R. at 11.)

In his response Mr. Plaza contends that he has never received "back benefits from onset date," apparently arguing that since he was found disabled as of April 15, 2000, then this means that he must also be found disabled during the closed period under consideration here from July 7, 1995 to April 29, 1999. (Doc. 12, at 1.) This is not true. While a later adjudication of disability *might* shed some light on an applicant's disability or non-disability at a prior time, it is irrelevant as to the question of whether the relevant contemporaneous objective medical evidence supports a finding that an applicant is disabled. Here, the relevant medical evidence consists of Mr. Plaza's medical records that were before the ALJ during the time period July 7, 1995 to April 29, 1999. The letter Mr. Plaza submitted to the court is dated August 4, 2000, well beyond the relevant time period.

Moreover, a review of the letter shows that it is insufficient evidence in any event. The letter is from Dr. Booker T. Evans, a psychiatrist at Community Integration, Inc., a facility where Mr. Plaza received medical evaluations and treatment from February 1997 through November 1998. Dr. Evans does not appear on any of the medical records and did not evaluate or treat Mr. Plaza during this time period. Nonetheless Dr. Evans writes that Mr. Plaza "became paranoid for the first time in August 1995 and since then has spiraled downwards." (Doc. 12, Ex. 1.) This opinion is at odds with the medical evidence and with the fact that Mr. Plaza actually was working as a laborer from April 29, 1999 through at least March 29, 2000, the date of the hearing, at World Resources, a recycling company. (R. at 309, 342.) We conclude that Dr. Evans' opinion regarding Mr. Plaza's limitations is inconsistent with substantial medical evidence to the extent that he does not acknowledge or account for Mr. Plaza's abilities in spite of his mental impairment as documented by the medical evidence and he does not acknowledge or account for Mr. Plaza's return to work in April 29, 2000.

Other than the above argument, Mr. Plaza does not identify any legal or factual errors in the ALJ's decision. Thus we review the ALJ's decision in order to determine whether it is supported by substantial evidence. As set forth below, we find that the ALJ's decision that Mr. Plaza was not disabled during the closed period is supported by substantial evidence

### A. Relevant Medical Evidence

As noted above, we confine our review to medical evidence concerning Mr. Plaza's mental impairments.

#### 1. Treatment at Hamot Institute for Behavioral Health

Mr. Plaza presented himself to Hamot Medical Center on August 22, 1995 "complaining of multiple 'traumas' in the past four to five years: a motor vehicle accident, shot at by unidentified person two years ago, [and a] work related accident five months ago, [and] requesting counseling and maybe some anxiety medicine." (R. at 248.)  A psychiatric evaluation was performed by Anne F. Newton, M.D., who noted that Mr. Plaza was alert, oriented in all spheres, neatly dressed and groomed, pleasant and cooperative. (R. at 249.)  Dr. Newton also remarked that Mr. Plaza had no formal thought disorder and that his speech and thought processes were clear, and at times tangential, while at other times they were goal oriented. (R. at 249.) His cognition, concentration, memory and abstraction were fair, and his judgments were presently stable. (R. at 249.) He denied hallucinations, suicidal ideation, homicidal ideation, and paranoid ideation. (R. at 249.) Dr. Newton also noted that Mr. Plaza was "loosely delusional," that he had no insight, that his mood was sad, and his affect was constricted. (R. at 249.)  She also noted that Mr. Plaza "many times mentioned SSI." (R. at 249.) Dr. Newton diagnosed Mr. Plaza with Paranoid Psychotic Disorder (versus Malingering); Dependent Personality, and assessed his Global Assessment Functioning at 35. (R. at 249.)

On November 6, 1995, Mr. Plaza was seen at Hamot by Psychologist Richard Sekula, M.A., on referral from Alex Ziga, M.D., to "assist in determination of possible malingering and to provide diagnostic impression." (R. at 119.) Dr. Sekula reported that Mr. Plaza was alert and fully oriented, and that he demonstrated no disorganized behavior or speech. (R. at 119.) Dr.

Sekula also noted that Mr. Plaza's speech was digressive, vague, overly concrete at times, and indecisive. (R. at 119-120.) At the time of testing, Mr. Plaza's IQ was estimated at around 90, and Dr. Sekula noted that some of his replies to the intellectual test questions were peculiar. (R. at 120.)

The Rorschach test results showed a suggestion of interpersonal ineptness, problems with emotional modulation and impulsivity, a distorted self-image, limited tendency for introspection, passivity and interpersonal guardedness, and a tendency to abuse fantasy in place of constructive planning, described as a specific type of disordered thinking. (R. at 120.) However, Dr. Sekula noted that Mr. Plaza's reality testing was normal, which is at odds with the "disordered thinking" result from the Rorschach test. (R. at 120.) Dr. Sekula concluded that this oddity raised the concern that Mr. Plaza had simulated his Rorschach responses. (R. at 120.)

Mr. Plaza's self-report personality inventory test results were thought to be valid. He denied suicidal or homicidal ideation, he reported that he heard voices at times, and did not report that he was depressed, anxious, or overly stressed. (R. at 120.) Dr. Sekula's diagnostic impression, consistent with Dr. Newton, was Psychotic Disorder, Not Otherwise Specified, Rule Out Malingering. (R. at 121.)

Mr. Plaza continued to receive treatment at Hamot in the form of counseling and medication checks for the next year. In total, he was seen for 34 visits. The progress notes indicate that during this time Mr. Plaza and his wife separated causing stress regarding his marriage, housing, and childcare. (R. at 122-127.) Mr. Plaza continued to complain of feeling tired, overwhelmed, and having sleep problems, but he was able to focus and prioritize at times and generally was less disorganized in his thinking. (R. at 122-127.) Mr. Plaza had counseling sessions with therapist Tish Osearo, M.A. through August 1996, when Ms. Osearo left Hamot. From August 1996 though November 1, 1996, Mr. Plaza was only seen for medication checks. He was discharged from Hamot's care on November 1, 1996, stabilized on 150 grams of Mellaril, to continuing treatment at Community Integration Inc.

## 2. Treatment at Community Integration, Inc.

Mr. Plaza was first seen at Community Integration on February 12, 1997. (R. at 146.) His treating psychiatrist was Mary Eileen Oseas-McNamara, M.D. (R. at 146-149; 286-290.) On Mr. Plaza's intake form it was noted that he had never had a psychiatric hospitalization, and that he began counseling at Hamot in August 1995 due to paranoia and suspiciousness. (R. at 146.) Mr. Plaza reported to Dr. Oseas-McNamara that he usually went to bed at 10:00 or 11:00 p.m. and took about twenty minutes to fall asleep. (R. at 147.) He would experience occasional awakenings during the night and arise at 11:00 a.m. (R. at 147.) He reported that he did not take naps. (R. at 147.) He also reported that he has been afraid to leave his house since he was shot and occasionally panicked for no reason. (R. at 147.) He also stated that at times he had trouble thinking and feels confused. (R. at 147.)

Dr. Oseas-McNamara reported that Mr. Plaza presented in a good mood, was jovial, interactive, and cooperative. (R. at 147-148.) At the time of the exam, Mr. Plaza denied that he was depressed. Dr. Oseas-McNamara also reported that Mr. Plaza "would have subtle loose associations at times and endorse some odd and idiosyncratic thinking about people controlling him." (R. at 148.) She concluded that Mr. Plaza was responding to Mellaril but "perhaps with some residual idiosyncratic thinking," and that as a result he may need to have his Mellaril increased or changed. (R. at 148.) At this initial evaluation she assessed his Global Assessment Functioning at 55. (R. at 290.)

In May 1997, after missing several appointments and failing to complete his laboratory work, Mr. Plaza reported to Dr. Oseas-McNamara that he had been looking for work and was out of medication. (R. at 149.) His medication was changed to Risperdal on June 17, 1997. (R. at 293.) On January 28, 1998, Dr. Oseas-McNamara assessed Mr. Plaza's Global Assessment Functioning at the higher level of 85. (R. at 290.) She also noted that Mr. Plaza's wife had just had a baby, and the family was again living together. (R. at 287.) She also stated that Mr. Plaza was having no loose associations, no hallucinations, and no paranoia. (R. at 287.) According to

the progress notes, Mr. Plaza experienced stress due to the new baby and other family issues, that he reported some paranoid thoughts, but was stable on his medication. (R. at 288-289.)

### 3. Non-Treating State Agency Psychiatrist Dr. Singh

Mr. Plaza was evaluated by the State Agency Psychiatrist Krupa Singh, M.D., on August 25, 1998. (R. at 250.) Dr. Singh completed a Psychiatric Activities Assessment, and a report on his consultation with Mr. Plaza. (R. at 254-257; 250-253.) Overall, Dr. Singh's assessment was consistent with the medical records reported from Hamot and Community Integrative Inc. He noted Mr. Plaza's historical diagnosis of paranoid delusional disorder, and also added that a question of malingering exists, and rule out schizoaffective disorder. (R. at 254.) He reported that Mr. Plaza could take care of himself and others, he could attend to activities of daily living, he had fair abilities in concentration and task persistence; he had fair abilities in adaption to stressful circumstances; and fair abilities in social functioning with some limitation on his ability to interact with co-workers and the public. (R. at 254-257.)

### 4. Non-Treating State Agency Psychologist Dr. Schiller

Douglas Schiller, Ph.D., assessed Mr. Plaza and completed a mental residual functional capacity form and a Psychiatric Review Technique Form ("PRTF") both dated September 16, 1998. (R. at 271-274; R. at 275-283.) Dr. Schiller's opinion on the PRTF was that Mr. Plaza had slight limitations in his activities of daily living, moderate limitations in maintaining social functioning, and often had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. (R. at 282.) On the mental residual functional capacity form, Dr. Schiller reported that Mr. Plaza was not significantly limited in all areas except that he was moderately limited in the following areas:

- ability to maintain attention and concentration over extended periods,
- ability to perform activities within a schedule,
- ability to work in coordination with or proximity to others,
- ability to accept instructions and respond appropriately to criticism from supervisors,

- ability to get along with coworkers or peers,

- ability to maintain socially appropriate behavior,

- ability to respond appropriately to changes in the work setting, and

- ability set realistic goals or make plans independently of others.

(R. at 271-272.) Dr. Schiller opined that while Mr. Plaza "has significant adjustment problems, it does appear he can understand and follow basic instructions, routines, and perform simple tasks in a structured, stable competitive setting." (R. at 273.) Dr. Schiller acknowledged a finite list of limitations graded as moderate impairments that would not rule out the ability to work for Mr. Plaza. This is consistent with Dr. Singh's assessment, as well as Dr. Oseas-McNamara's and Dr. Newton's.

## B. Discussion

As previously discussed, Mr. Plaza's argument appears to be that since he was found disabled as of April 15, 2000, he logically must be found to have been disabled during the time period from 1995 to 1999 at issue in this case. As we have determined, however, being found disabled does not mean that a claimant must have been disabled under the Social Security Act at a previous time. We note that under the Act, the burden is on the claimant to show not only that he suffers from a mental impairment, but also that the impairment is so severe that it prevents him from engaging in any substantial gainful activity existing in the national economy. Thus, Mr. Plaza's treating physicians, Dr. Oseas-McNamara and Dr. Newton, both agreed that Mr. Plaza suffered from a mental impairment during the relevant time period, but the ALJ determined that Mr. Plaza was not disabled under the Act.

In addition, Mr. Plaza's submission of a letter from his current treating psychiatrist was not in the record before the ALJ. Even if we were to examine this letter we would be compelled to give it little to no weight, first, because it does not substantively speak to the time frame at issue, and second, because its conclusions are inconsistent with the objective medical evidence of record.

11

We find no reason to disturb the ALJ's decision that Mr. Plaza was not disabled under the Act during the time period July 9, 1995 to April 29, 1999. Our review of the record evidence and the parties' submissions show that the ALJ's decision is supported by substantial consistent medical evidence from Mr. Plaza's treating physicians and from the state agency physicians.

### C. Substantial Evidence

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer, 186 F.3d at 427. We find that the Commissioner's decision is based on substantial evidence.

### V. Conclusion

For the foregoing reasons, we hold that the decision of the Commissioner that Mr. Plaza was not disabled during the relevant closed time period is supported by substantial evidence. Accordingly, an appropriate order will be entered granting the Commissioner's motion for summary judgment and denying Mr. Plaza's motion for summary judgment.

An appropriate order will be entered.


June 14, 2006
Date

Hon. Maurice B. Cohill, Jr.
Senior United States District Court Judge


cc:     counsel of record

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEFFREY E. PLAZA,                )
                                 )
        Plaintiff,               )
                                 )
                                 )    C.A. 05-203 Erie
                                 )
COMMISSIONER OF SOCIAL           )
SECURITY,                        )
                                 )
        Defendant.               )

## ORDER

AND NOW, this ___14th___ day of June, 2006, it is hereby ORDERED, ADJUDGED and DECREED that Plaintiff's Motion for Summary Judgment (Doc.9) is DENIED and Defendant Commissioner of Social Security's Motion for Summary Judgment (Doc. 10) is GRANTED.

Summary Judgment is entered in favor of Defendant Commissioner of Social Security and against Plaintiff.

_____
Maurice B. Cohill, Jr.
Senior United States District Judge

cc:    counsel of record